RENDERED:  OCTOBER 9, 2020; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2018-CA-1440-MR

BRAYDEN MICHAEL JONES, A MINOR, BY
AND THROUGH HIS MOTHER AND DULY
APPOINTED CONSERVATOR, BOBBIE JEAN JONES       APPELLANT


                    APPEAL FROM CARROLL CIRCUIT COURT
                    HONORABLE R. LESLIE KNIGHT, JUDGE
v.                     ACTION NO. 12-CI-00187


IC BUS, LLC; RON DEITZ AND KELLY DEITZ,
INDIVIDUALLY, AND AS CO-ADMINISTRATORS
FOR THE ESTATE OF RYDER DEITZ; CHRIS
TUTTLE AND STACY TUTTLE, INDIVIDUALLY,
AND AS CO-ADMINISTRATORS FOR THE
ESTATE OF CAROLINE TUTTLE; VERONICA
LANDA AND MIGUEL LANDA, INDIVIDUALLY,
AND AS PARENTS AND GUARDIANS OF JOSE
M. ARDON-LANDA, A MINOR; SAMANTHA ROBLES,
AS PARENT AND GUARDIAN OF MARIAH ROBLES,
A MINOR; TINA GIVIDEN; TANYA FAULKNER,
INDIVIDUALLY, AND AS GUARDIAN FOR JORDAN
RAISOR, A MINOR; AND KENTUCKY EMPLOYERS
MUTUAL INSURANCE COMPANY                 APPELLEES

AND
NO. 2018-CA-1442-MR


CHRIS TUTTLE AND STACY TUTTLE,
INDIVIDUALLY, AND AS CO-ADMINISTRATORS
FOR THE ESTATE OF CAROLINE TUTTLE                    APPELLANTS


                    APPEAL FROM CARROLL CIRCUIT COURT
                    HONORABLE R. LESLIE KNIGHT, JUDGE
v.                  ACTION NOS. 12-CI-00187 & 13-CI-00096


IC BUS, LLC                                          APPELLEE


AND
NO. 2018-CA-1443-MR


RON DEITZ AND KELLY DEITZ,
INDIVIDUALLY, AND AS CO-ADMINISTRATORS
FOR THE ESTATE OF RYDER DEITZ                        APPELLANTS


                    APPEAL FROM CARROLL CIRCUIT COURT
                    HONORABLE R. LESLIE KNIGHT, JUDGE
v.                  ACTION NOS. 12-CI-00187 & 13-CI-00097


IC BUS, LLC                                          APPELLEE

AND
NO. 2018-CA-1444-MR


TANYA FAULKNER, INDIVIDUALLY,
AND AS GUARDIAN FOR JORDAN RAISOR,
A MINOR                                                          APPELLANT


APPEAL FROM CARROLL CIRCUIT COURT
HONORABLE R. LESLIE KNIGHT, JUDGE
v.          ACTION NOS. 12-CI-00187 & 13-CI-00096


IC BUS, LLC                                                      APPELLEE


AND
NO. 2018-CA-1445-MR


VERONICA LANDA AND MIGUEL LANDA,
INDIVIDUALLY, AND AS PARENTS AND GUARDIANS
OF JOSE M. ARDON-LANDA, A MINOR                  APPELLANTS


APPEAL FROM CARROLL CIRCUIT COURT
HONORABLE R. LESLIE KNIGHT, JUDGE
v.          ACTION NOS. 12-CI-00187 & 13-CI-00126


IC BUS, LLC                                                      APPELLEE

AND
NO. 2018-CA-1446-MR


SAMANTHA ROBLES, AS PARENT AND GUARDIAN
OF MARIAH ROBLES, A MINOR                          APPELLANT


                    APPEAL FROM CARROLL CIRCUIT COURT
                    HONORABLE R. LESLIE KNIGHT, JUDGE
v.                  ACTION NOS. 12-CI-00187 & 13-CI-00127


IC BUS, LLC                                        APPELLEE

OPINION
AFFIRMING IN PART, REVERSING IN PART,
VACATING IN PART, AND REMANDING

* * * * * *

BEFORE:  CLAYTON, CHIEF JUDGE; ACREE AND DIXON, JUDGES.

DIXON, JUDGE:  Brayden Michael Jones, a minor, by and through his mother

and duly appointed conservator, Bobbie Jean Jones; Chris Tuttle and Stacy Tuttle,

individually, and as co-administrators of the estate of Caroline Tuttle; Ron Deitz

and Kelly Deitz, individually, and as co-administrators of the estate of Ryder

Deitz; Tanya Faulkner, individually, and as guardian for Jordan Raisor, a minor;

Veronica Landa and Miguel Landa, individually, and as parents and guardians of

Jose M. Ardon-Landa, a minor; and Samantha Robles, as parent and guardian of

- 4 -

Mariah Robles, a minor (collectively "Appellants"), appeal various orders and judgments entered by the Carroll Circuit Court. Following review of the record, briefs, and law, we affirm in part, reverse in part, vacate in part, and remand.

## FACTS AND PROCEDURAL BACKGROUND

This action arises from a tragic school bus accident occurring on October 29, 2012, involving a bus manufactured by IC Bus, LLC. On that date, the school bus driver inexplicably left the roadway, overcorrected, and careened off the road, causing the bus to turn on its side and strike a large tree. The impact collapsed the roof nearly to the floor in a v-shape, crushing and killing two of its preschool occupants and injuring several others.

The procedural history of this case is lengthy and complex; therefore, we will only discuss the pertinent portions herein. Litigation began two weeks after the crash when the parents of two of the children injured, Cruz and Hollingsworth (who did not join in this appeal), sued Laura Reed, the driver of the bus, and various school officials. Thereafter, in the summer of 2013, the Tuttles and Deitzes, parents of the two children killed in the crash, and Robles and the Landas, parents of two of the children injured, each separately filed suit for negligence only against Reed. Reed subsequently filed a third-party complaint against IC Bus and later moved to consolidate all of the separate actions brought against her. The trial court granted the motion "for discovery purposes." Raisor

later filed an intervening complaint in the consolidated action. Eventually, all of the parties filed amended complaints, suing IC Bus for various claims in strict liability, breach of implied warranties, failure to warn of inherent dangers, and negligence.

In March 2014, Reed moved the trial court to join Jones, maintaining he was a necessary party pursuant to Kentucky Rules of Civil Procedure (CR) 19.01. On June 9, 2014, after the matter was fully briefed, the trial court ordered Jones to file an intervening complaint.

Prior to trial, all claims against all defendants except IC Bus were resolved. A jury trial then commenced on Appellants' claims against IC Bus on April 23, 2018.

At trial, Appellants called three witnesses to support their design defect and failure to warn claims: Dr. Tyler Kress, P.E., an expert in engineering safety; Erin Shipp, P.E., a bus design engineer; and Dr. David Porta, a forensic trauma consultant and trauma reconstructionist. At the close of Appellants' proof, IC Bus moved for directed verdict, which the trial court granted on all issues except Appellants' product liability claim for defective bus clips. At the end of the two-and-a-half-week trial, the jury returned a defense verdict and the trial court entered judgment consistent therewith. Additionally, the court ordered that Appellants pay IC Bus's costs.

Subsequently, Appellants moved the trial court for a new trial and for judgment notwithstanding the verdict, alleging various trial court errors. Appellants' motion was denied, and these appeals followed. Because Jones's appeal and the remaining appeals require separate analysis, we begin our review with Jones.

## I. JONES'S APPEAL

Jones asserts the trial court erred by joining him as a party to this action and by ordering him to file an intervening complaint. This issue appears to be one of first impression in our Commonwealth.[1]

As previously noted, Jones was joined as a party to the litigation upon Reed's CR 19.01 motion. This rule permits joinder of additional parties to a lawsuit under certain limited circumstances. However, if the party sought to be joined refuses, as Jones attempted to do herein, the rule permits the trial court to join that party as a defendant, if necessary and if feasible.

The trial court initially merely joined Jones as a party under the rule. ROA[2] at 2976. Thereafter, Reed's counsel sent a letter to Jones's counsel informing him of the court's order joining Jones as a party to the litigation.

---

[1] Indeed, it appears to be an issue of first impression in all of the courts in the United States, as our extensive research has failed to uncover even one case directly on point.

[2] Record on Appeal.

However, he went on to state, "[i]f you intend to file a *Complaint* . . . we request you do so in the next twenty (20) days.  Otherwise, we plan to move for default judgment . . . ."  ROA at 3264 (emphasis added).  Jones then moved the court, without submitting to its jurisdiction, to clarify its order "to specifically address what, if any, obligations [Jones] has, which defendants he is required to sue, what facts he is entitled to rely upon in order to justify that suit and which claims he must make" so as to comply with the requirements of CR 11.[3]  In response, Reed asked the trial court to compel Jones's participation in the case by filing a *complaint*, if any, within thirty days.  ROA at 3252.  After hearing the parties' arguments, the trial court denied Jones's motion, granted Reed's motion, and ordered Jones to file his complaint within forty days.  ROA at 3316.  Jones appealed that order, but his appeal was dismissed as interlocutory.  Therefore, in compliance with the trial court's order, on September 15, 2014, Jones filed his complaint against Reed and IC Bus.  However, Jones continued to dispute his joinder throughout the litigation.

---

[3] The rule states in relevant part:

> The signature of an attorney or party constitutes a certification by him that he has read the pleading, motion or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

The issues now before us are: (1) under what circumstances may a trial court join a non-party, against their will, in pending litigation; (2) in what capacity may they be joined; and (3) how the infancy of the party sought to be joined might affect these decisions.

As to joinder, we are mindful:

> The decision as to necessary or indispensable parties rests within the sound authority of the trial judge in order to effectuate the objectives of the rule. The exercise of discretion by the trial judge should be on a case-by-case basis rather than on arbitrary considerations and such a decision should not be reversed unless it is clearly erroneous or affects the substantial rights of the parties.

*Commonwealth, Dep't of Fish & Wildlife Res. v. Garner*, 896 S.W.2d 10, 14 (Ky. 1995) (quoting *West v. Goldstein*, 830 S.W.2d 379 (Ky. 1992)).

Resolving Jones's argument of error requires us to correctly interpret joinder under CR 19.01, entitled "Persons to be joined if feasible." The rule provides:

> A person who is subject to service of process, either personal or constructive, shall be joined as a party in the action if (a) in his absence complete relief cannot be accorded among those already parties, or (b) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so

joined, the court shall order that he be made a party.  If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case an involuntary plaintiff.  If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

The trial court herein failed to identify its basis for compelling Jones's joinder as a necessary party.  Kentucky courts have interpreted CR 19.01 as follows:

> "An indispensable party[4] is one whose absence prevents the Court from granting complete relief among those **already parties**." *Milligan v. Schenley Distillers, Inc.*, 584 S.W.2d 751, 753 (Ky. App. 1979) (*superseded by statute on other grounds*).  Likewise, the Court in *West v. Goldstein*, 830 S.W.2d 379 (Ky. 1992), characterized a necessary party as one whose interest would be divested by an adverse judgment.

*Kentucky Ass'n of Fire Chiefs, Inc. v. Kentucky Bd. of Hous., Bldgs. & Const.*, 344 S.W.3d 129, 134 (Ky. App. 2010), *as modified* (Jan. 14, 2011) (emphasis added).

*See also Liquor Outlet, LLC v. Alcoholic Beverage Control Bd.*, 141 S.W.3d 378, 387 (Ky. App. 2004).

---

[4] As noted by Judge (now Justice) VanMeter, "although CR 19.01 was amended to omit the exact language 'indispensable party,' this analysis is still applicable to determine necessary parties for joinder. *See Liquor Outlet, LLC v. Alcoholic Beverage Control Bd.*, 141 S.W.3d 378 (Ky. App. 2004) (applying CR 19.01 and using the term 'indispensable party')." *Ambrose v. Ward*, Nos. 2013-CA-000814-MR and 2013-CA-001000-MR, 2016 WL 447753, at *2 n.4 (Ky. App. Feb. 5, 2016).

CR 19.01 is patterned after, and is essentially the equivalent of, Federal Rule of Civil Procedure (FRCP) 19(a).[5]  The only significant difference between the two concerns federal jurisdiction.  Therefore, cases analyzing the federal rule are highly relevant in determining the proper interpretation and application of CR 19.01.  Under FRCP 19, there is a bifurcated process for determining whether a non-party is either necessary under subsection (a) or

[6] FRCP 19(a) states:

(a)  Persons Required to Be Joined if Feasible.

(1) *Required Party.*  A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A)  in that person's absence, the court cannot accord complete relief among existing parties; or

(B)  that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

(2)  *Joinder by Court Order.*  If a person has not been joined as required, the court must order that the person be made a party.  A person who refuses to join as a plaintiff may be made either a defendant or, in a proper case, an involuntary plaintiff.

- 11 -

indispensable under subsection (b).[6,7]  From a review of the varied decisions

concerning CR 19.01 and its federal counterpart, it is apparent some confusion

exists as to how the rule is to be applied.  The Sixth Circuit Court of Appeals set

forth a framework for how such determinations are to be made in *American*

*Express Travel Related Services, Co., Inc. v. Bank One-Dearborn, N.A.*:

> Rule 19 lays out a three-step test for courts to use
> in determining whether an absent party must be joined.
> [FRCP] 19.  First, the court must determine whether the
> party is necessary and should be joined under Rule 19(a).

---

[6] FRCP 19(b) states:

(b) When Joinder Is Not Feasible.  If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed.  The factors for the court to consider include:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

(A) protective provisions in the judgment;

(B) shaping the relief; or

(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

[7] In Kentucky, FRCP 19 is divided into CR 19.01 and CR 19.02.  The latter rule addresses indispensability and is essentially identical to FRCP 19(b).

> If the person or entity is a necessary party, the court looks to whether joinder is feasible, or if a lack of subject matter or personal jurisdiction makes joinder impossible. Third, if joinder is not possible, the court must weigh the equities of the situation pursuant to Rule 19(b) and determine if the suit can continue in the party's absence or if the case should be dismissed because the party is indispensable. *See* [FRCP] 19; *Hooper v. Wolfe*, 396 F.3d 744, 747 (6th Cir. 2005); *Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 666 (6th Cir. 2004).

195 F. App'x 458, 460 (6th Cir. 2006). *See also PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 200-01 (6th Cir. 2001); *Keweenaw Bay Indian Cmty. v. State*, 11 F.3d 1341, 1345-46 (6th Cir. 1993); *Local 670, United Rubber, Cork, Linoleum & Plastic Workers of Am., AFL-CIO v. Int'l Union, United Rubber, Cork, Linoleum & Plastic Workers of Am., AFL-CIO*, 822 F.2d 613, 618 (6th Cir. 1987).

In support of Jones's joinder pursuant to CR 19.01, Reed argued that any cause of action Jones might have would involve "a common issue of negligence" and that failure to join Jones would "impair and impede [her] ability to defend herself." Therefore, she argued, the cases "should properly be tried together to advance the convenience of the court and the parties and to avoid unnecessary expense or delay," and failure to join Jones would cause Reed to "suffer undue prejudice." ROA at 2636. Apparently, the undue prejudice of which Reed wrote is that she "would inevitably have to submit to multiple depositions and potentially multiple trials regarding the same legal and factual

- 13 -

issues," which she contended "would likely result in inconsistent judicial rulings and financial and personal hardship." ROA at 2636.

Reed was certainly correct that failure to join Jones *might possibly* result in multiple depositions and multiple trials should Jones file suit at some point before the expiration of the applicable statute of limitations; nevertheless, such is not a legitimate rationale under the plain language of the rule to force joinder upon a party declining the invitation. Neither Reed's nor the court's convenience constitutes a factor for proper joinder under CR 19.01.

Reed's arguments for Jones's joinder are similar to those considered and rejected by the First Circuit Court of Appeals in *Delgado v. Plaza Las Americas, Inc.*, 139 F.3d 1 (1st Cir. 1998). Therein, Delgado's daughter was sexually abused and raped at a shopping center. Delgado sued the shopping center seeking damages for the emotional pain and suffering he experienced as a result of his daughter's rape. The trial court determined that Delgado's daughter was a necessary party to the litigation under FRCP 19(a)(2)(ii), reasoning:

> [T]he potential for inconsistent verdicts in [Daughter's] state action and Delgado's federal action subjected defendants to a substantial risk of incurring multiple or otherwise inconsistent obligations. The court also observed that allowing the two actions to proceed would be an inefficient use of judicial resources and raised the specter of one of the plaintiffs using "offensive collateral estoppel" against defendants.

- 14 -

*Id.* at 2 (footnote omitted). On appeal, the First Circuit considered the correct interpretation and application of the Federal Rule. The Court noted that although a plaintiff has the right to control his litigation, FRCP 19(a) balances that right "against the defendants' (and systemic) interests in avoiding judgments giving rise to 'inconsistent obligations.'" *Id.* at 3 (citation omitted). The Court went on to explain the meaning of "inconsistent obligations" under the Rule:

> "Inconsistent obligations" are not, however, the same as inconsistent adjudications or results. *See Micheel v. Haralson*, 586 F.Supp. 169, 171 (E.D. Pa. 1983); *see also* 4 James Wm. Moore *et al.*, Moore's Federal Practice ¶ 19.03 (3d ed. 1997). Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident. *See* 4 Moore's at ¶ 19.03. Inconsistent adjudications or results, by contrast, occur when a defendant successfully defends a claim in one forum, yet loses on another claim arising from the same incident in another forum. *See National Union Fire Ins. Co. of Pittsburgh v. Massachusetts Mun. Wholesale Elec. Co.*, 117 F.R.D. 321, 322 (D. Mass. 1987) (citing *Bedel v. Thompson*, 103 F.R.D. 78, 81 (S.D. Ohio 1984)); *see also Boone v. General Motors Acceptance Corp.*, 682 F.2d 552, 554 (5th Cir. 1982) (the threat of inconsistent obligations, not multiple litigations, informs [FRCP] 19(a) considerations); *Field v. Volkswagenwerk AG*, 626 F.2d 293, 301 (3d Cir. 1980) (similar). Unlike a risk of inconsistent obligations, a risk that a defendant who has successfully defended against a party may be found liable to another party in a subsequent action arising from the same incident—i.e., a risk of inconsistent adjudications or results—does not necessitate joinder of all of the parties into one action pursuant to [FRCP] 19(a). *See Field*, 626 F.2d at 301. Moreover, where two

- 15 -

> suits arising from the same incident involve different causes of action, defendants are not faced with the potential for double liability because separate suits have different consequences and different measures of damages. *See In re Torcise*, 116 F.3d 860, 866 (11th Cir. 1997).

*Id.* With these considerations in mind, the Court then rejected the trial court's holding as to joinder:

> In this situation, defendants faced a federal action and a state action arising from the same incident. In reasoning that defendants could be facing "inconsistent obligations," the district court noted that defendants could be found liable to Delgado in federal court, but not liable to [Daughter] in state court, or vice versa. Although the court also looked to other factors in reaching its conclusion, it is this determination—which is really a determination that defendants faced the threat of ***inconsistent results***—that grounded the court's ruling that [Daughter] was a necessary party to this lawsuit. Yet as we have explained, the mere possibility of inconsistent results in separate actions does not make the plaintiff in each action a necessary party to the other.

*Id.* (emphasis added). *See also LeBlanc v. Cleveland*, 248 F.3d 95 (2d Cir. 2001); *Rishell v. Jane Phillips Episcopal Mem'l Med. Ctr.*, 94 F.3d 1407 (10th Cir. 1996).

Moreover, the mere fact that several tort actions may be instituted by different persons arising out of the same incident does not render all complaining parties necessary to each other's action. "When several tort actions instituted by different persons arise out of the same incident, the complaining parties need not be joined in the suits brought by the others." 7 CHARLES ALAN WRIGHT &

ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1623 (3d ed. 1972)

(footnote omitted). "As a general matter, Rule 19 does not necessitate the joinder

of plaintiffs advancing tort claims against the same defendant for injuries arising

out of the same transaction or occurrences." *Cortez v. County of Los Angeles*, 96

F.R.D. 427, 428 (C.D. Cal. 1983), *declined to follow by Aguilar v. Los Angeles

Cty.*, 751 F.2d 1089 (9th Cir. 1985) (citations omitted). Reed fails to put forward

any substantive argument supporting her claim that Jones's non-joinder would

impede her ability to defend herself. Again, unnecessary expense is not relevant

to a CR 19.01 analysis. Reed neglects to explain how Jones's non-joinder would

cause *any* delay in the ongoing litigation among "those already parties."

As noted, the rule permits joinder under subsection (a) if "in [the

party's] absence complete relief cannot be accorded among those already parties."

As explained in *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, the Third

Circuit Court of Appeals observed:

> Under Rule 19(a), we ask first whether complete relief
> can be accorded to the parties to the action in the absence
> of the unjoined party. [FRCP] 19(a)(1). A Rule 19(a)(1)
> inquiry is limited to whether the district court can grant
> complete relief to the persons already parties to the
> action. *The effect a decision may have on the absent
> party is not material.*

11 F.3d 399, 405 (3d Cir. 1993) (emphasis added) (citation omitted). Furthermore,

"[i]t is a misapplication of Rule 19(a) to add parties who are neither necessary nor

indispensable, who are not essential for just adjudication and who have a separate cause of action entirely." *Bakia v. County of Los Angeles*, 687 F.2d 299, 301 (9th Cir. 1982) (citation omitted). Ascertaining who may meet the criteria of "necessary" has been explained as follows:

> [I]f the interests of necessary parties are separable from those of parties before the court, so that the court can proceed to a decree, and do complete and final justice, without affecting other persons not before the court, the persons not before the court are not [necessary] parties, and the court may proceed with the case and adjudicate upon the rights of those who are made parties.

59 AM.JUR.2D *Parties* § 114 (2020) (footnotes omitted). None of the parties (especially the claimants) herein have alleged that complete and final justice could not be obtained without Jones's joinder. In fact, the Tuttles and Deitzes responded to Jones's motion that they took "no position as to whether Brayden Jones should be involuntarily joined to the above litigation since the issue does not affect these plaintiffs' claims." ROA at 3278. As explained in *Corpus Juris Secundum*:

> Parties are not necessary to a complete determination of the controversy unless they have *rights which must be ascertained and settled* before the rights of the parties to the suit can be determined. Accordingly, a person is not a necessary party where he or she has *no interest in the subject matter of the litigation which can be affected by a judgment or decree rendered therein* as where an adjudication of the rights of the other parties would in no way affect his or her rights or where his or her presence before the court is not necessary to a determination of the issues joined between the parties to

- 18 -

the action.

67A C.J.S. *Parties* § 3 (2020) (emphasis added) (footnotes omitted).  No one has seriously argued Jones's interest in the subject matter of the litigation—*i.e.*, his right to pursue a tort claim later—would be affected by his failure to join the instant litigation against Reed and IC Bus.  Thus, no valid basis was presented pursuant to CR 19.01(a) to mandate Jones's joinder under this subsection.  And, since Jones cannot be viewed as a necessary party, there is no rationale for addressing any other provision of the rule.  Therefore, in view of the fact that Jones cannot be considered a necessary party to the litigation, his joinder was erroneous and must be reversed.

Moreover, even were Jones a necessary party requiring joinder under CR 19.01, the trial court clearly exceeded its authority by requiring Jones to file suit as a matter of joinder.  The rule itself clearly places limitations on the capacity in which one may be joined; "[i]f [the necessary party] should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case an involuntary plaintiff." *See generally Elborough v. Evansville Cmty. Sch. Dist.*, 636 F.Supp.2d 812, 826 (W.D. Wis. 2009).  Nothing within the rule, however, permits the court to order the joined party to file a complaint as a part of the litigation.  As stated by Jones's counsel in his motion to clarify the trial court's order, there are serious considerations as to what defendants to sue and what

claims will be made so as not to run afoul of CR 11.  Yet, here, the trial court

*required* counsel to make claims against others, with little time to do so, regardless

of CR 11 considerations.

Furthermore, Jones was merely four years old at the time of the

school bus crash, and only six when he was ordered to file suit herein.  The statute

of limitations is specifically tolled until one year after Jones reaches the age of

majority.[8]  Nevertheless, the trial court ran roughshod over those considerations in

favor of the defendant's—and its own—convenience.

Early on, courts in the Commonwealth recognized our responsibility

to protect the interests of children.  The earliest case noting this special

relationship cited courts of chancery in England which directed the estates of

children for their protection.  *Allen's Ex'rs v. Allen's Heirs*, 12 Ky. (2 Litt.) 94

(1822).  "It is the especial duty of the chancellor to guard the interests of infants,

and the law has carefully provided that their rights shall be protected."  *District of

Clifton v. Pfirman*, 110 S.W. 406, 408 (Ky. 1908).  *See also Wilson's Adm'r v.*

---

[8] Kentucky Revised Statutes (KRS) 413.170(1) provides:  "If a person entitled to bring any action mentioned in KRS 413.090 to 413.160, except for a penalty or forfeiture, was, at the time the cause of action accrued, an infant or of unsound mind, the action may be brought within the same number of years after the removal of the disability or death of the person, whichever happens first, allowed to a person without the disability to bring the action after the right accrued."

*Wilson*, 288 Ky. 522, 156 S.W.2d 832 (1941); *Newland v. Gentry*, 57 Ky. (18 B. Mon.) 666 (1857).

Herein, Jones's mother, Bobbie, objected to joining the litigation brought in the name of the other children impacted by the crash. According to counsel's brief:

> Bobbie Jones strongly objected to being involved in a lawsuit. Her reasons were private, but later forced to be disclosed: her son was suffering from severe personality and behavior changes as a result of his exposure to the carnage of the crash and being trapped in the bus before being extricated. Her family wanted to focus on healing, she did not want her son's condition to be made public, she did not want the glare of publicity surrounding the case to invade her family's privacy and since she did not know what her son's future held she wanted time for him to heal and time to have the assistance of doctors to assess the extent of his injuries and the help of an attorney to explore her options.

Appellants' brief at 2. As a result of Jones's joinder, he was forced to undergo an IME,[9] forced to expend money on litigation expenses, and ultimately ordered to pay a portion of the defendant's costs, all as a result of litigation Jones was forced, over objection, to join or lose any claims he might make in the future—claims he was legally entitled to make at any point over the next decade.

---

[9] Independent medical examination.

We have already determined Jones's joinder was erroneous and must be vacated; yet, we are left to wonder what "justice" we have advanced—certainly none as contemplated by our judiciary in 1822. *Allen's Ex'rs*, *supra*. We are unable to rewind the court proceedings or undo the costs of litigation already incurred—both financial and emotional. Nevertheless, we have achieved all that we may legally decree, and all Jones has asked, by vacating the trial court's order of joinder, as well as costs assessed against him by the trial court—a hollow victory indeed.

## II.  REMAINING CLAIMS

### ISSUES ON APPEAL

Appellants' theory of their case against IC Bus rests primarily in tort for negligence and strict liability for the manufacture and design of the school bus at the center of the litigation herein. However, they additionally sought liability for breach of warranty and violation of the Kentucky Consumer Protection Act (KCPA)—KRS 367.220. Appellants raise numerous issues on appeal. They include trial court error by:  (1) granting IC Bus's motion for directed verdict concerning claims of defective bus roof design, failure to warn, and dismissal of their punitive damage claims; (2) denial of their motion for directed verdict; (3) dismissal of their claims of breach of warranty and violation of the KCPA; (4)

instructional error; (5) exclusion of admissible evidence; (6) juror misconduct; and finally, (7) the award of IC Bus's costs. We address each of these issues in turn.

## STANDARD OF REVIEW

### a. Directed Verdict

The standard of review of a trial court's grant of directed verdict is well-established. "[A] directed verdict is appropriate where there is no evidence of probative value to support an opposite result because the jury may not be permitted to reach a verdict upon speculation or conjecture." *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 285 (Ky. 2014), *as corrected* (Apr. 7, 2015) (internal quotation marks, brackets, and footnote omitted). "[A] trial court should only grant a directed verdict when there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ." *Id*. (internal quotation marks and footnote omitted).

### b. Summary Judgment

As to summary judgment, the standard of review is

whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law. Kentucky Rules of Civil Procedure (CR) 56.03. There is no requirement that the appellate court defer to the trial court since factual findings are not at issue. "The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor."

- 23 -

Summary "judgment is only proper where the movant shows that the adverse party could not prevail under any circumstances."

*Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996), *as modified* (Feb. 2, 1996) (citations omitted).

### c. Evidentiary Rulings

We review a trial court's evidentiary rulings for abuse of discretion. *Tumey v. Richardson*, 437 S.W.2d 201, 205 (Ky. 1969). "The test for an abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound reasonable principles." *Penner v. Penner*, 411 S.W.3d 775, 779-80 (Ky. App. 2013) (citation omitted).

### d. Jury Instructions

As for jury instructions, "a trial court's decision on whether to instruct on a specific claim will be reviewed for abuse of discretion; the substantive content of the jury instructions will be reviewed *de novo*." *Sargent v. Shaffer*, 467 S.W.3d 198, 204 (Ky. 2015), *as corrected* (Aug. 26, 2015).

### 1) DIRECTED VERDICT FOR IC BUS

Appellants contended at trial that IC Bus had manufactured a school bus with two different design defects of which it had failed to warn its purchasers. At the close of Appellants' proof, the court directed a verdict for IC Bus on one of the alleged design defect claims and on the claim of failure to warn. The court

also directed a verdict for IC Bus on the Appellants' claim for punitive damages.

Appellants argue each of these decisions was erroneous and must be reversed.

## a. Product Liability

This case falls within the class of products liability actions known as "crashworthiness" claims. According to 4 American Jurisprudence Proof of Facts 3d 131 (2020):

> The crashworthiness doctrine is a variation of the strict liability theory of the Restatement of Torts and imposes on the plaintiff more rigorous proof requirements than a typical section 402A action. The crashworthiness doctrine extends the manufacturer's liability to situations in which the defect did not cause the accident or initial impact, but rather increased the severity of the injury over that which would have occurred absent the defective design.

> Under the crashworthiness doctrine the manufacturer of an automobile is required to foresee that its car may be involved in a collision during normal operation and to design the vehicle so that it is not unreasonably dangerous to its occupants in such a contingency. In other words, the car must be made "crashworthy," and the manufacturer may be liable for a car occupant's collision injuries to the extent that they were caused or enhanced by the car's lack of crashworthiness; liability may be imposed on both negligence and strict liability grounds. . . .

> To recover under the doctrine, the plaintiff has the burden of proving that the product was defective in condition or design when it left the manufacturer and that he or she was injured while using the product in its intended manner. Further, the plaintiff must prove that

> the product was unreasonably dangerous, i.e., dangerous to an extent beyond that which would be contemplated by the user with ordinary knowledge common to the community. . . .

Id. at §18 (internal references and footnotes omitted). Herein, Appellants' complaint against IC Bus is not that any defect in the condition of the bus actually caused the initial accident but, rather, that the defective condition of the roof and clips holding the chassis together exacerbated the injuries to the Appellants. One element necessary to succeed on a crashworthiness claim is proof of a "feasible alternative design" available at the time of manufacture.

Appellants, nevertheless, maintain that proof of a feasible alternative design is unnecessary to prevail on their claims herein. Yet, they fail to distinguish their claims from the clear language expressed by the Court in *Toyota Motor Corporation v. Gregory*, which wrote, "Kentucky law, as stated in *Jones* [*Jones v. Hutchinson Mfr., Inc.*, 502 S.W.2d 66 (Ky. 1973)] and *Rice* [*Ingersoll-Rand Co. v. Rice*, 775 S.W.2d 924 (Ky. App. 1988)], stands for the proposition that design defect liability requires proof of a feasible alternative design." 136 S.W.3d 35, 42 (Ky. 2004), *as amended* (Jun. 14, 2004). It is not enough to ground their position upon the fact that the plaintiff in *Gregory* made a binding admission of the necessity of a feasible alternative design, somehow hamstringing the Court to agree; nor is their suggestion that the Court therein limited the application of its

holding to the specific facts of that case sufficient. Where language is clear, as here, there is no basis for implication. The language from *Gregory* quoted above is not amenable to more than one interpretation—proof of a feasible alternative design *is* necessary for design defect liability.

In response, Appellants maintain they, nevertheless, provided sufficient proof of feasible alternative designs as required to prevail on their defective design claims. At trial, Appellants presented two separate theories of design defect: one involving the design of the bus roof and the other involving defective clips which held the bus together. Since the crashworthiness claim on the clips was presented to the jury, this argument focuses solely on feasible design alternatives concerning the bus's roof, proof of which Appellants contend met their burden.

Appellants rely on the testimony and reports of their expert engineers, Dr. Tyler Kress and Erin Shipp, for proof of feasible alternative designs available to IC Bus at the time the bus herein was manufactured.

First, Dr. Kress testified at trial about three potential feasible design alternatives: (1) doubling the number of bus bows,[10] (2) doubling the strength of existing bus bows, and (3) adding a single longitudinal stringer to the bus roof.

Dr. Kress's report opined that using two additional longitudinal stringers (bow spacers running from the front to the back of the bus on its sides and/or roof) would have decreased the amount of crush, or roof intrusion into the passenger compartment of the bus, to a so-called "yellow zone,"[11] reducing passenger injuries to minor, as opposed to severe, and preventing passenger fatalities. Dr. Kress further reported that had three (or more) additional stringers been used, the amount of crush would have been reduced to a "green zone" and potentially eliminated all passenger injuries. VROA[12] 4-27-18 at 3:04-05.

Dr. Kress testified that he performed calculations using the amount of energy from the collision and the strength of the materials in determining that these feasible design alternatives would have reduced the amount of crush by about one-half. VROA 4-27-18 at 3:04-07. One of his calculations indicated that the amount of crush would have been reduced to twenty-eight inches, well within Dr. Porta's green zone. VROA 4-27-18 at 3:07-08. Dr. Kress further testified that these designs were certainly feasible and that "it doesn't take a whole lot more

---

[10] A "bow" is also described as a "rib." It is a curved piece of metal which serves as part of the structure of the passenger compartment of the bus. The bow runs from the floor of the bus continuously up the side, along the roof, and down the other side to the floor.

[11] Dr. David Porta divided the amount of crush into three zones: red, yellow, and green. The red zone was depicted as the amount of actual crush, which led to the death and injuries at issue in this case. The yellow and green zones depicted areas of reduced crush, which would lessen and prevent injury, respectively, in the same scenario had the bus been designed differently.

[12] Video Record on Appeal.

metal" for these designs. VROA 4-27-18 at 3:10. Additionally, he stated that his alternative designs were available at the time of manufacture of the subject bus, and even decades earlier. Admittedly, Dr. Kress did not specifically state that his proposed alternative designs would not violate weight or other restrictions imposed by federal, state, or local regulations (which the trial court found significant). However, neither did he testify that they would violate such standards. But Dr. Kress did testify his designs were feasible. The Merriam-Webster Dictionary defines "feasible" as: "1) capable of being done or carried out; 2) capable of being used or dealt with successfully: suitable; and 3) reasonable, likely." *Feasible*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/feasible (last visited Oct. 4, 2020). Certainly, one may reasonably argue that Dr. Kress's designs complied with all regulations, based upon his testimony that the designs are "feasible," *i.e.*, suitable, capable of being used successfully, or reasonable, which would presuppose compliance; otherwise, these designs could hardly be called "suitable," "capable of successful use," or "reasonable" alternatives.

Shipp testified at trial by deposition and, additionally, submitted a report of her opinions. As to feasible design alternatives, her report opined:

> Simply by revising the spanner above the window
> opening to better hold a load and transfer the load to the
> bows would be a simple solution that would create a

- 29 -

stronger structure for a tip-over and slide into a pole or tree. An additional beam attached to the existing structure would also improve the strength of the roll-over and impact.

ROA at 6701. While this report did not quantify the degree to which such changes would have reduced the bus's deformity or the Appellants' injuries from the accident, it did assert that the amount of crush would be less. Although Shipp's report also did not specifically state whether such modifications would comply with federal, state, or local regulations, the assertion that "[t]hese design changes were technologically and economically feasible at the time this bus was designed and manufactured" certainly implies the bus would comply with regulations and be drivable. ROA at 6702. Moreover, Shipp testified regarding an actual bus she designed for Bluebird with a longitudinal stringer on its roof. She detailed testing the bus body with longitudinal reinforcements for Bluebird buses, as well as Thomas buses; however, she was aware of no test data with regard to how these alternative designs would withstand a similar crash. Shipp Depo.,[13] 10-18-17 at 25-27, 90-91. Again, although Shipp did not specifically testify whether such modifications would comply with all regulations, it may be inferred from her work on Bluebird buses with longitudinal stringers that such a bus was manufactured, drivable, and compliant with regulations.

---

[13] Deposition.

In its judgment granting the directed verdict in favor of IC Bus on this issue, the trial court stated:

> [I]t is not enough that an alternative design be proposed; the design must also be "practical under the circumstances." The Court found that Plaintiffs failed to present evidence that the design was practical under the circumstances, and granted directed verdict on this basis.
>
> The undisputed testimony at trial was that adding bows to the bus's design would increase the bus's weight, and therefore impact its handling and center of gravity.[14] Furthermore, the undisputed testimony was that Kentucky strictly regulated the size of windows on school buses, and that adding bows would affect the size of windows such that the design would no longer comply with Kentucky standards. Other regulations were discussed as well. Plaintiffs did not produce evidence showing that a bus using its proposed design changes would comply with state and federal regulations, or that the bus would still be drivable with the added weight. Without such evidence, a reasonable juror could not find that the alternative design was "practical under the circumstances." A design is not "practical" if it does not comply with federal and state regulations, or is not drivable, because such a bus could not be sold.

ROA at 11,752 (footnote added). These findings discount Dr. Kress's testimony, however, concerning his proposed alternative designs, as well as his testimony that "it doesn't take a whole lot more metal to make a significant difference in

---

[14] The trial court goes too far in its assertion that "[t]he undisputed testimony at trial was that adding bows to the bus's design would increase the bus's weight, and therefore impact its handling and center of gravity." ROA at 11,752. In fact, no witness testified in that manner. To the contrary, Dr. Kress testified that his alternative designs were certainly feasible for decades

- 31 -

strength." VROA 4-27-18 at 3:10. Contrary to the presumptions of the trial court, most of the proposed alternative designs offered by Dr. Kress and Shipp would not impact the windows. The only design proffered that would presumably affect the windows was Dr. Kress's proposal to double the amount of bus bows/ribs alluded to by the trial court. However, Dr. Kress also proposed doubling the strength of the existing bows, as well as adding one, two, three, or more longitudinal stringer(s) to the bus roof. VROA 4-27-18 at 3:04-05. Furthermore, Shipp proposed revising the spanner *above* the window opening to better hold a load and transfer the load to the bows, as well as adding a beam to the existing structure. ROA at 6701. Neither of Shipp's proposed alternative designs appears likely to affect the windows, and certainly there was no testimony that it would do so. Shipp's longitudinal reinforcements for Bluebird and Thomas implied that buses with "stiffer, stronger" bodies were ultimately produced, supporting the Appellants' contention that such designs were practical by being drivable without violating any regulations—including those concerning the windows.

Review of case law concerning other crashworthiness claims demonstrates the level of proof required to present this type of issue to a jury. *See*, *e.g.*, *Gregory*, 136 S.W.3d at 41 (holding elements of crashworthiness claim are:

prior to the manufacture of this bus, and it does not take a whole lot more metal to make a significant difference in strength. VROA 4-27-18 at 3:00-10.

(1) practical alternative *safer* design; (2) proof of injuries resulting had safer alternative design been used; and (3) method establishing extent of enhanced injuries attributable to defective design); *Estate of Bigham v. DaimlerChrysler Corp.*, 462 F.Supp.2d 766, 773 (E.D. Ky. 2006) (essential in crashworthiness claims to offer alternative designs that can be tested and proof of product defectiveness); and *Gray v. General Motors Corp.*, 312 F.3d 240, 242 (6th Cir. 2002) (appellant's failure to offer proof of a feasible alternative design and evidence to establish the extent of injuries had alternative design been utilized was fatal to his claim).

The testimony of both Dr. Kress and Shipp created a question of fact concerning *whether there was* an alternative feasible bus roof design sufficient to survive directed verdict. Additionally, the testimony of Drs. Kress and Porta concerning the *extent of injuries sustained* had the feasible design alternatives been used was also sufficient to survive a directed verdict. Consequently, the trial court erred in granting a directed verdict on the issue of crashworthiness based on the roof's design.

**b. Failure to Warn**

Appellants also argue the trial court erred in directing a verdict on their claims that IC Bus failed to warn occupants of its bus of the potential danger

due to defective design.  To prevail on a failure to warn claim, Appellants were required to prove the following:

> A plaintiff asserting causes of action based on a failure to warn must prove not only that no warning was provided, or that the warning was inadequate, but also that the inadequacy or absence of the warning caused the injury, or establish that a duty to warn against reasonably foreseeable risks existed, a breach of that duty occurred, and the injuries were proximately caused by the breach.  To establish a claim for strict liability based on a failure to warn, the plaintiff must prove, among other things, that the manufacturer had a duty to warn of the product's dangerous propensities and that the lack of an adequate warning made the product defective and unreasonably dangerous.

AM. L. PROD. LIAB. 3D Pt. 9, *Warnings*, § 34:1 (footnotes omitted).

The key evidence upon which Appellants base their failure to warn claims concerns a patent, and patent submission documents, for rollover protection for school buses.  Appellants contend that patent documents submitted in 2008 by several independent contractors and an employee of Navistar, the parent company of IC Bus, demonstrate IC Bus had actual knowledge that "[s]chool bus rollovers are the single deadliest type of injury" and the FMVSS[15] does "not provide adequate rollover protection to the occupants" of school buses.  ROA at 8285.

---

[15] Federal Motor Vehicle Safety Standard.

This patent submission described a rollover protection structure that would create a protective zone around the driver and schoolchildren in the event of a rollover. It proposed a "design [] rigid enough to withstand the actual dynamic loads produced during a high-speed school bus lateral overturn." ROA at 8290. The submission went on to claim that

> [t]his invention provides an improved rollover protection structure, wherein the fuselage structure resists the localized buckling of the upright roll bar members during lateral rollover of the school bus, without appreciably increasing the weight and cost of the product. More specifically, the object of this invention is to provide a school bus body construction in which light weight roof and side sheets are employed for all exposed panels on the body. Light weight panels have many advantages in that they produce a quiet body, may be molded into exact sizes, may be formed economically from plastics or composites, may be readily replaced in case of accident or damage, and result in lighter construction. When bonded to the rollover protection structure, is assembled with substantial labor savings.

ROA at 8290. Appellants further note the patent submission admits a "school bus rollover protection structure can be immediately implemented on existing International Truck and Engine Corporation IC chassis." ROA at 8290.

Shipp testified in her deposition, read at trial, that absent the existence of a feasible safer design, the manufacturer should warn purchasers and end users of the dangers of the current design during rollovers because roof crush due to roadside objects is a reasonably foreseeable risk. Shipp Depo., 10-18-17 at

81-89. Dr. Kress testified that such an accident is "very foreseeable." VROA 4-27-18 at 2:50. Shipp opined, "You should use the design, guard, warn hierarchy to determine what the best protection for your customers is." She further testified that she found no evidence IC Bus did any analysis toward that determination. Shipp Depo., 10-18-17 at 81, 89.

It is undisputed that IC Bus made no effort to warn the purchaser or users of the bus at issue here. What is disputed is whether IC Bus was under such a duty. The trial court initially denied IC Bus's motion for partial summary judgment, finding sufficient evidence of record to establish a duty to warn. However, the trial court later determined that its order denying summary judgment was erroneous because Appellants failed to establish IC Bus's "actual or constructive knowledge of the school bus's inherent dangerousness," thereby triggering a duty to warn. ROA at 11,753. The trial court relied on the statement in the patent that "[i]n recent actual rollover accidents, the roof structure above the lower side glass sill has completely collapsed during the dynamic rollover event, even though the school bus design complied with FMVSS 220." ROA at 11,754. The trial court reasoned that this statement implies the roof could collapse in a 180-degree or greater rollover but is not indicative of what would happen in a 90-degree rollover and impact with a large tree, as happened here. The trial court also stated that had there been a duty to warn, a directed verdict would still be

warranted based on Appellants' failure to present proof that the failure to warn was causally linked to the injuries. ROA at 11,754.

Warnings are required after manufacture if the manufacturer becomes aware of, or should be aware of, a dangerous or defective condition with its product. *Montgomery Elevator Co. v. McCullough by McCullough*, 676 S.W.2d 776, 782 (Ky. 1984). Applied to the case herein, if IC Bus knew or should have known of the danger triggering the duty to warn, it had a nondelegable duty to warn the end users, *i.e.*, bus passengers. *Id.* If evidence of the patent and/or patent documents is allowed, it tends to show that IC Bus was aware of a defective condition concerning its roof design and should have warned the end users (bus passengers). IC Bus's contention that the patent documents apply only to 180-degree rollovers is not persuasive. The information in the patent and patent submission are indicative of a structural problem with the design of the roofs on its school buses. To equate this knowledge only to 180-degree rollovers would support a "head in the sand" approach, *i.e.*, that if no testing occurs it cannot be charged with knowledge of a defect. Such would lead to an absurd result and allow manufacturers to intentionally fail to test their products in order to evade liability. Apart from the patent documents, the testimony of Dr. Kress and Shipp was that this type of accident was foreseeable. VROA 4-27-18 at 2:50; Shipp Depo., 10-18-17 at 70, 86-89. Consequently, a jury could conclude that warnings

to end users should have ensued based upon this testimony. Because there was not a complete absence of evidence on this issue, the directed verdict was improper and entry of such was error.

Additionally, contrary to the trial court's conclusion, Appellants were not required to offer proof they would have heeded a warning had one been given. Comment j under Section 402A of the Restatement (Second) of Torts,[16] states:

> Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.

*See also Bryant v. Hercules Inc*., 325 F.Supp. 241, 246 (W.D. Ky. 1970). This vitiates the portion of the trial court's order holding that had there been a duty to warn, a directed verdict would still be warranted based on Appellants' failure to present proof that the failure to warn was causally linked to the injuries.

### c. Punitive Damages

Appellants further argue the trial court erred in directing a verdict on the issue of punitive damages. Our rulings on the previous issues presented in this appeal render this issue moot. In *Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012),

---

[16] This section was adopted by the high court of Kentucky in *Dealers Transport Co. v. Battery Distributing Co*., 402 S.W.2d 441, 446-47 (Ky. 1965), *as modified on denial of reh'g* (May 13, 1966).

the appellate court addressed moot issues because they were likely to recur if the case was retried. It noted:

> This Court has consistently engaged in this type of review. *See*, *e.g.*, *Blane v. Commonwealth*, 364 S.W.3d 140, 154 (Ky. 2012); *Sanderson v. Commonwealth*, 291 S.W.3d 610, 614 (Ky. 2009) (citations omitted); *Bell v. Commonwealth*, 245 S.W.3d 738, 743 (Ky. 2008) ("Because the judgment has been reversed for the foregoing reasons, we will address only those additional assignments of error that are likely to recur upon retrial."); *Terry v. Commonwealth*, 153 S.W.3d 794, 797 (Ky. 2005) ("We will also address other issues that are likely to recur upon retrial."); *Springer v. Commonwealth*, 998 S.W.2d 439, 445 (Ky. 1999) ("Because the other issues raised by the appellants are likely to recur upon retrial, those issues will also be addressed in this opinion.").

*Id.* at 13 n.35. Here, by contrast, even though our decision reinstates claims upon which punitive damages could be found, we cannot say whether this issue is likely to recur if the case is retried as it will be dependent upon proof then presented. Therefore, because it is neither likely nor unlikely that the issue of punitive damages will recur on retrial, we deem discussion of it—at least at this point—improper and decline to do so.[17] Nevertheless, we reiterate the high bar necessary to prove a claim for punitive damages. As stated by our high court in *Nissan Motor Company, Ltd. v. Maddox*,

---

[17] This does not definitively foreclose punitive damages claims which may be available on remand depending on the proof presented.

> "In order to justify punitive damages there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by wanton or reckless disregard for the lives, safety, or property of others." *Gibson v. Fuel Transport, Inc.*, 410 S.W.3d 56, 59 (Ky. 2013). *See also Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 52 (Ky. 2003) (defining gross negligence as "a wanton or reckless disregard for the lives, safety or property of others.").

486 S.W.3d 838, 840 (Ky. 2015), *as modified on denial of reh'g* (May 5, 2016).

## 2) APPELLANTS' MOTION FOR DIRECTED VERDICT

### a. Failure to Warn

Not only do Appellants argue the trial court erred by granting IC Bus's motion for directed verdict on their failure to warn claim, they further contend the court erred by not granting their own motion for directed verdict on this issue. They contend IC Bus offered no evidence to refute their affirmative evidence on this claim, and more particularly offered no rebuttal of Shipp's testimony. Conversely, however, the evidence presented did not conclusively prove IC Bus knew, or should have known, that it had manufactured an unreasonably dangerous school bus. It is possible the jury could have reached the same conclusion as the trial court, *i.e.*, that IC Bus was not aware of the potential dangers of its design in this type of accident, and that the rollover protection patent only pertained to danger in 180-degree-plus rollover events. Here,

- 40 -

construing the evidence in the light most favorable to IC Bus requires us to look at the patent as the trial court did—that such did not constitute conclusive knowledge of a defect in 90-degree rollover impact accidents.

Appellants also argue the trial court erred by denying their motion for directed verdict based on IC Bus's failure to warn of the dangerously defective chassis clips. Similarly, if we assume IC Bus neither knew nor should have known of the defective condition of the clips, like the roof, then there is no duty to warn. Shipp testified there were alternative designs that, if used, would have relieved the duty to warn. However, the jury—as trier of fact—may choose to disbelieve the evidence Appellants presented on this issue. The issue of causation is ordinarily one for a jury to determine. Viewing the evidence in this light, the trial court did not err by denying Appellants' motion for directed verdict on this issue.

### b. Other Claims

Appellants further contend they were entitled to directed verdict on all other claims, including design defect (the crashworthiness claims regarding the clips and roof design) and punitive damages. Appellants note IC Bus's sole expert witness was Stephen Werner. Werner is an accident reconstruction expert with over thirty years' experience who has performed several thousand accident reconstructions. Werner testified at trial in this case for nearly three hours but

- 41 -

offered no opinion as to whether the condition of the bus was defective. When questioned about the types of testing IC Bus performs on its buses, Werner testified he was not aware of any tests conducted by IC Bus that directly relate to this type of crash. He was questioned at length about the clips connecting the body to the chassis of the bus. He testified the "failure" of the clips was caused when they released due to the roof crushing into the seats, which bent the floor of the bus upon impact with the tree. He acknowledged he did not test the clips, nor was he aware of whether IC Bus had tested the clips in a manner similar to that presented by this accident. Nor was Werner aware of any engineering analysis, including mathematical or physical testing, by IC Bus on the bus connectors.

We believe Appellants' argument presumes too much, however. Were we to agree that there was a complete absence of proof that IC Bus's design was not unreasonably dangerous, we would strip the jury of its role as factfinder. "Evaluation of the weight which should be given to expert testimony is the exclusive province of the jury[.]" *Ellison v. R & B Contracting, Inc.*, 32 S.W.3d 66, 76 (Ky. 2000) (footnote omitted). The jury is always free to disregard—or disbelieve—an expert's opinion. As noted in *Ellison*, a reasonable inference drawn from evidence does not "evaporate when an 'expert' expresses an opinion contrary to [that] inference. The expert's opinion is additional evidence for the jury to consider in deciding the issue, but no more and no less." *Id*. at 77.

Applied to the case herein, based on the totality of the evidence, it can be reasonably determined that IC Bus did not have to produce its own expert testimony in support of its position that there was no defect in the design rendering the bus unreasonably dangerous. It is Appellants' burden to prove their claims. It is the job of the trier of fact to weigh the reliability of evidence and to believe—or disbelieve—offered proof. Here, Appellants' evidence was not so strong as to refute any possible inference in favor of IC Bus so that reasonable men could not have differed. *See Sutton v. Combs*, 419 S.W.2d 775, 777 (Ky. 1967). Thus, Appellants' motion for directed verdict was properly denied.

### 3) BREACH OF WARRANTY

Appellants next contend the trial court erred in dismissing the breach of warranty and KCPA claims before trial. The trial court dismissed these claims via summary judgment due to lack of privity of contract. In a quite novel argument, Appellants maintain they should be considered the "family" of the bus's buyer, the Carroll County Board of Education ("Board"), and they had a "special" relationship with the Board. They tenuously attempt to extrapolate some sort of parenthood to the Board via the Supreme Court's decision in *Williams v. Kentucky Department of Education*, 113 S.W.3d 145 (Ky. 2003), a case concerning a claim for negligent supervision against a teacher.

Appellants' arguments notwithstanding, no statutory authority exists for such an interpretation. For example, according to Kentucky's codification of its Consumer Protection Act, KRS 367.220 provides:

> (1) Any person who purchases or leases goods or services primarily **for personal, family or household purposes** and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by KRS 367.170, may bring an action under the Rules of Civil Procedure in the Circuit Court in which the seller or lessor resides or has his principal place of business or is doing business, or in the Circuit Court in which the purchaser or lessee of goods or services resides, or where the transaction in question occurred, to recover actual damages.

(Emphasis added.) Nor may Appellants qualify under Kentucky's Uniform Commercial Code (UCC) statute, KRS 355.2-318, on their implied warranty claims. That statute provides:

> A seller's warranty whether express or implied extends to any natural person **who is in the family or household of his buyer or who is a guest in his home** if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section.

(Emphasis added.) Clearly, the Board did not purchase the bus "for personal, family or household purposes," nor are Appellants in the Board's "family or household" or "guest[s] in [its] home." Thus, contrary to their argument,

- 44 -

Appellants cannot be considered part of the Board's "family" pursuant to either of these statutes. While it might take a village to raise a child, such does not make a school extended family. "[A] seller's warranty protections are *only* afforded to one with whom there is privity of contract, or, to use the terms of the statute, a 'seller's' warranty protections are *only* afforded to 'his buyer.'" *Compex Int'l Co., Ltd. v. Taylor*, 209 S.W.3d 462, 465 (Ky. 2006) (emphasis in original). Similarly, here, the warranty protections were only afforded to the Board, not Appellants. Appellants do not fall within any of the listed exceptions in the statutes. Simply put, there is no privity of contract between the parties to support a KCPA or breach of warranty claim on behalf of Appellants.

We are not at liberty to add to the KCPA or UCC to allow Appellants to enforce warranties against IC Bus when they were neither the bus's buyers nor in the buyer's natural family. *See Travelers Indem. Co. v. Reker*, 100 S.W.3d 756, 765 (Ky. 2003). Nevertheless, Appellants list nine cases from nine different jurisdictions abolishing the vertical privity requirement and urge us to do likewise. However, as pointed out by *Brown Sprinkler Corporation v. Plumbers Supply Company*, 265 S.W.3d 237, 240 (Ky. App. 2007), our legislature has not elected to enact such an extension. Thus, we may not modify or expand the law in this area. Because Appellants failed to establish the required privity of contract with IC Bus to sustain these claims, the trial court properly disposed of them as a matter of law.

# 4) JURY INSTRUCTIONS

Appellants contend the trial court erred in the instructions given to the jury herein. The Supreme Court has identified two types of errors involving jury instructions in *Sargent v. Shaffer*.

> The first type of instructional error is demonstrated by the claim that a trial court either (1) failed to give an instruction required by the evidence, or (2) gave an instruction that was not sufficiently supported by the evidence. . . . The second type of instructional error is represented by the claim that a particular instruction given by the trial court, although supported by the evidence, was incorrectly stated so as to misrepresent the applicable law to the jury.

> The trial court must instruct the jury upon every theory reasonably supported by the evidence. "Each party to an action is entitled to an instruction upon his theory of the case if there is evidence to sustain it." . . . [w]ith respect to the first type of instructional error, in deciding whether to give a requested instruction the trial court must decide "whether the evidence would permit a reasonable juror to make the finding the instruction authorizes."

> . . . .

> . . . A decision to give or to decline to give a particular jury instruction inherently requires complete familiarity with the factual and evidentiary subtleties of the case that are best understood by the judge overseeing the trial from the bench in the courtroom. Because such decisions are necessarily based upon the evidence presented at the trial, the trial judge's superior view of that evidence warrants a measure of deference from

> appellate courts that is reflected in the abuse of discretion standard.
>
> However, when it comes to the second type of instructional error—whether the text of the instruction accurately presented the applicable legal theory—a different calculus applies. Once the trial judge is satisfied that it is proper to give a particular instruction, it is reasonable to expect that the instruction will be given properly. The trial court may enjoy some discretionary leeway in deciding what instructions are authorized by the evidence, but the trial court has no discretion to give an instruction that misrepresents the applicable law. The content of a jury instruction is an issue of law that must remain subject to *de novo* review by the appellate courts.

467 S.W.3d at 203-04 (citations and footnotes omitted).

Here, Appellants allege the trial court made both types of instructional error. Because resolution of Appellants' claims of error as to the second type of instructional error will, necessarily, resolve both of Appellants' claims of error, we will address the second type of error first.

Under the second category, Appellants take issue with the instructions actually given by the trial court. They claim instruction number three was erroneously given for three reasons: it (1) failed to address the issue of whether the bus was unreasonably dangerous or defective; (2) confusingly referred to "clips," "body," and "chassis"; and (3) misleadingly used the phrase "substantial factor in increasing the Plaintiffs' injuries."

Concerning Appellants' first two assignments of error, they offer no further explanation, nor do they refer us to legal authority to support their contention. "It is not our function as an appellate court to research and construct a party's legal arguments[.]" *Hadley v. Citizen Deposit Bank*, 186 S.W.3d 754, 759 (Ky. App. 2005). We will not search the record to construct Appellants' argument for them, nor will we go on a fishing expedition to find support for their underdeveloped argument. "Even when briefs have been filed, a reviewing court will generally confine itself to errors pointed out in the briefs and will not search the record for errors." *Milby v. Mears*, 580 S.W.2d 724, 727 (Ky. App. 1979) (citation omitted). Absent further explanation or legal authority to support this contention, we cannot say the trial court abused its discretion as to the jury instruction at issue based upon the first two reasons.

For their third complaint of instructional error, Appellants specifically take issue with the trial court's use of the word "increasing" in the instruction. During their argument before the trial court, Appellants requested it be replaced with the phrase "causing or increasing." On appeal, Appellants now attempt to distinguish their claims from those involving crashworthiness, such as *Gregory*. Appellants state "the proof at trial did ***not*** suggest that the Appellants suffered injuries due to their own conduct or the conduct of someone else ***before*** the roof

crushed them."[18]  We disagree as this is, indeed, a second impact claim.  The first

impact—for which negligence is not charged to IC Bus—occurred as a result of

Reed's alleged negligence causing the accident in the first place.  Any injuries to

Appellants solely due to that portion of the crash would constitute the first impact.

The injuries resulting from the allegedly defective roof and chassis clips represent

the second impact.  Thus, Appellants' burden was to prove the amount of

enhanced or increased injuries received compared to what they would have

sustained had the feasible alternative design been used in the same scenario, *i.e.*, a

90-degree rollover and impact with a large tree.

Appellants contend this does not necessarily require a jury to find

Appellants would actually have sustained injuries had a feasible alternative design

been used.  Appellants' proof at trial was that had the school bus been equipped

with one of its design alternatives, it was possible no injury would have occurred.

Dr. Porta testified, had the crush been reduced to a "green zone," Appellants

would have sustained no injuries from the crash.[19]  As previously addressed, Dr.

Kress testified that, according to his calculations, the feasible design alternatives

he offered would have reduced the amount of crush by about one-half, well within

---

[18] Appellants' brief at 38.

[19] As previously noted, Dr. Porta divided the amount of crush into three zones:  red, yellow, and green.  The red zone depicts the amount of actual crush, which led to the death and injuries

Dr. Porta's green zone. VROA 4-27-18 at 3:04-07. Therefore, Appellants claim

use of the word "increasing" was prejudicial because it mandates the jury must

find Appellants were already injured or would have been injured even if a feasible

alternative design had been used. This is a reasonable argument, especially given

the testimony of Drs. Kress and Porta that had one of the proposed feasible

alternative designs been used, the Appellants would have sustained either no

injuries or only minimal injuries. VROA 4-27-18 at 3:04-07; VROA 4-30-18 at

11:24-30.

Erroneous jury instructions are presumptively prejudicial.

In this jurisdiction it is a rule of longstanding and frequent repetition that erroneous instructions to the jury are presumed to be prejudicial; that an appellee claiming harmless error bears the burden of showing affirmatively that no prejudice resulted from the error. This view was recently expressed in *Drury v. Spalding*, [812 S.W.2d 713, 717 (Ky. 1991)], with a quotation from *Prichard v. Kitchen*, [242 S.W.2d 988 (Ky. 1951)], as follows:

The rule is that generally an erroneous instruction is presumed to be prejudicial to appellant, and the burden is upon appellee to show affirmatively from the record that no prejudice resulted; and when the appellate court cannot determine from the record that the verdict was not influenced by the erroneous instruction, the judgment will be reversed.

herein. The yellow and green zones depict areas of reduced crush, which would reduce and prevent injury, respectively. VROA 4-30-18 at 10:36, 11:01-07, 11:24-30.

*McKinney v. Heisel*, 947 S.W.2d 32, 35 (Ky. 1997). Thus, the term "increasing," as used without qualification in the jury instruction, was inappropriate. The trial court, at the very least, should have exchanged the word "increasing" for the phrase "causing or increasing" as Appellants requested. The failure to do so, therefore, constitutes reversible error. This determination necessarily obviates a need to address Appellants' claim of error for failure to instruct as to its other claims. Because we have reversed, and the case will be remanded for a new trial on all claims, all other instructional errors are, therefore, moot.

### 5-7) PATENT ADMISSIBILITY; JUROR MISCONDUCT; COSTS

Finally, we decline to address Appellants' remaining issues on appeal as they are now rendered moot as a result of our decision to reverse and remand Appellants' claims for a new trial. Therefore, no discussion of these issues is necessary except to decree that the award of costs is hereby vacated.

### CONCLUSION

Therefore, and for the foregoing reasons, the orders and judgments entered by the Carroll Circuit Court joining Brayden Michael Jones are VACATED, as well as the judgment against him; directed verdict against Appellants dismissing their claims for product liability and failure to warn is REVERSED; denial of directed verdict for Appellants is AFFIRMED; dismissal

of Appellants' KCPA and breach of warranty claims is AFFIRMED; jury instruction number three is REVERSED and, therefore, the jury's judgment for Appellee is VACATED; order on costs is necessarily VACATED; and the matter REMANDED for further proceedings consistent with this Opinion.

ALL CONCUR.

BRIEFS FOR APPELLANT
BRAYDEN MICHAEL JONES, A
MINOR, BY AND THROUGH
HIS MOTHER AND DULY
APPOINTED CONSERVATOR,
BOBBIE JEAN JONES:

Marcus S. Carey
Erlanger, Kentucky

BRIEFS FOR APPELLANTS CHRIS
TUTTLE AND STACY TUTTLE,
INDIVIDUALLY, AND AS CO-
ADMINISTRATORS FOR THE
ESTATE OF CAROLINE TUTTLE;
RON DEITZ AND KELLY DEITZ,
INDIVIDUALLY, AND AS CO-
ADMINISTRATORS FOR THE
ESTATE OF RYDER DEITZ;
TANYA FAULKNER,
INDIVIDUALLY, AND AS
GUARDIAN FOR JORDAN RAISOR,
A MINOR; VERONICA LANDA
AND MIGUEL LANDA,
INDIVIDUALLY, AND AS
PARENTS AND GUARDIANS OF
JOSE M. ARDON-LANDA, A
MINOR; AND SAMANTHA
ROBLES, AS PARENT AND
GUARDIAN OF MARIAH ROBLES:

Gary R. Hillerich
Kevin C. Burke
Jamie K. Neal
Lawrence Young
T.J. Smith
Louisville, Kentucky

Dwight Preston
Elizabethtown, Kentucky

BRIEFS FOR APPELLEE:

Elaine M. Stoll
Douglas W. Rennie
Gregory A. Kendall
Timothy C. Ammer
Matthew E. Stubbs
Lindsay M. Upton
Cincinnati, Ohio

53